UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

-against-

HORACIO LARRANGA LOPEZ,

Defendant.
-----------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAY 2 5 2006 ★
P.M.
TIME A.M.
MEMORANDUM

05-CR-655 (SLT)

TOWNES, United States District Judge:

In February 2006, defendant Horacio Larranga Lopez moved, *inter alia*, to suppress statements defendant allegedly made on August 11 and 12, 2005. In a Memorandum and Order dated March 31, 2006, this Court granted defendant a hearing on the issues of (1) whether the agents read Lopez his *Miranda* rights before the August 12, 2005, interrogation, (2) whether Lopez knowingly and voluntarily waived those rights and made a voluntary statement and (3) whether suppression is appropriate under 18 U.S.C. §3501(c).

On April 24, 2006, this Court conducted that hearing and denied Lopez's suppression motion. Since the Court did not have time to place its finding of fact and conclusions of law on the record, it promised to issue a written decision (93-94).[1] As promised, this Memorandum sets forth the Court's findings and conclusions.

### FINDINGS OF FACT

At the suppression hearing, the government presented two witnesses – DEA Special Agents David Campbell and Ivonne Martinez – who had been present at Lopez's arrest on August 11, 2005, and at his interrogation on the morning of August 12, 2005. This Court fully credits their testimony.

---

[1] Numbers in parentheses refer to numbers in the transcript of the April 24, 2006, hearing, which is docketed herewith. If preceded by the name of a witness, the numbers cite to portions of that witness's testimony.

On August 11, 2005, a team of DEA agents, including Campbell and Martinez, arrested Lopez in a hotel room at the Marriott Hotel near LaGuardia Airport in Queens (Campbell: 5, 12; Martinez: 57). Although the arrest did not take place until approximately 9:30 p.m., the agents had already had Lopez under continuous surveillance for almost 12 hours, having followed him since he arrived at Kennedy Airport around 10 that morning (Campbell: 5-6, 21). By the time of the arrest, Campbell had been working well over 24 hours, and many of the other agents had been working since early that morning (Campbell: 13).

When the DEA agents first entered the hotel room, Lopez was with three other individuals: the two co-defendants – Robert Arellano and Virginia Anaya – and Luis Gonzalez, an interpreter who had accompanied the Spanish-speaking Lopez to New York from California (Campbell: 20). Within a few minutes of their entry, the agents asked Lopez if he was willing to cooperate (Campbell: 16-17; Martinez: 66). Lopez was not read his *Miranda* rights before this question was asked (Campbell: 22-23; Martinez: 68). Therefore, although Lopez agreed to cooperate, was questioned about his suppliers and had recorded telephone conversations with an alleged California-based supplier (Campbell: 6, 18-19; Martinez: 68-69), the government does not seek to introduce on its direct case any of the statements made by Lopez that evening.

Neither Campbell nor Martinez could remember exactly how long Lopez remained at the hotel following the arrest (Campbell: 25, 27; Martinez: 69). Campbell estimated that it took "[a]n hour or two" to gather evidence and Lopez's numerous personal effects and estimated that Lopez left at approximately 10:30 or 11:00 p.m.(25, 27-28). Martinez only remembered that "it wasn't that long" (69). However, both witnesses agreed that Lopez was driven from the hotel room to the DEA offices on 17th Street in Manhattan (Campbell: 27; Martinez: 59). Campbell explained that the agents elected not to take Lopez to the Metropolitan Detention Center

2

("MDC") because they anticipated continuing their efforts to have him make a controlled delivery, and because "it can take several hours to put a prisoner in MDC and pull him out of the jail facility" (52). Campbell and Martinez did not return to the DEA offices with Lopez, but went home for the night (Campbell: 29; Martinez: 60, 70).

At the DEA offices, Lopez was housed in one of three small cells, approximately 10 feet long and 6 feet wide (Campbell: 30). The cell did not contain a bed or a chair, but contained a toilet, a combination water basin/drinking fountain and a wooden bench approximately 8 to 10 inches wide (Campbell: 10, 31, 33). Although Campbell was not in the DEA offices that night, he testified that other agents had the prisoners under surveillance and reported seeing Lopez lying down on the bench (38-39). Campbell further testified that it was standard practice not to provide prisoners with blankets (38), but that the offices, although air-conditioned, were usually warm (34, 52).

Campbell arrived at the DEA offices around 7:30 a.m. the next morning, August 12, 2005 (29). Upon his arrival, he and other agents met with a supervisor and decided that it would be futile to attempt a controlled delivery. They reasoned that Lopez's cell phone had not rung recently because the other party to the prospective delivery had "probably made surveillance" and was aware that Lopez was in custody (8, 43, 54). Instead, the agents decided to take a post-arrest statement, then take Lopez to an "initial appearance" (8).

A little after 8 a.m., and shortly after Martinez arrived at the office, Martinez, another agent and, perhaps, Campbell brought Lopez from his cell to an interview room (Campbell: 44; Martinez: 61, 65). Since Lopez had not eaten that morning (Campbell: 39), Martinez, pursuant to her usual practices, offered the prisoner food and water (Martinez: 63). Lopez did not request

3

food, but had a bottle of water with him throughout the interview (Martinez: 62-63). Lopez was not handcuffed at any time during the interrogation (Campbell: 10, 46: Martinez: 64).

Martinez, who was the only Spanish-speaker in the room, began the interrogation by reading Lopez his *Miranda* rights in Spanish (61-62). Although she did not have Lopez sign a form acknowledging that he understood his rights (74), Martinez demonstrated for the Court the precise manner in which she had read these rights and credibly testified that Lopez verbally acknowledged understanding each right and agreed to speak with her (76-77). Martinez questioned Lopez for 20 or 30 minutes (75).

Martinez testified that, during their conversation, Lopez was articulate and that he "sounded . . . educated" and "fairly intelligent" (63-64). Although Campbell was "in and out of the room a few times" and did not understand Spanish, he testified that Lopez appeared to know "what was going on," and seemed both calm and "willing to cooperate, to do what he could to get out of trouble" (11, 46). According to Martinez, the temperature was "comfortable" in the interrogation room, and Lopez never complained that he was cold, hungry or thirsty or that he had a headache (63, 70).

After the questioning, Lopez was transported to the United States Courthouse in Brooklyn (Campbell: 11). Campbell did not state exactly when Lopez left the DEA offices, but testified that the trip to the courthouse would take "anywhere from 15 minutes to 45 minutes," depending on traffic (41), and that Lopez arrived at the courthouse around 9:30 or 10 a.m. (52). At the courthouse, marshals escorted Lopez first to Pre-Trial Services, and then to a courtroom (11). Although this Court will take judicial notice that Lopez was arraigned before Magistrate Judge Steven M. Gold on August 12, 2005, *see United States v. Anaya et al.*, 05-mj-1036 (SMG), neither this Court's records nor the testimony at the hearing indicated precisely when this arraignment took place.

## CONCLUSIONS OF LAW

Based on these findings of fact, this Court concluded that suppression of defendant Lopez's August 12, 2005, statement was unwarranted. First, this Court found that the government met its burden of showing that Lopez was properly advised of his *Miranda* rights prior to giving the statement. This Court fully credited Special Agent Martinez's testimony that she read Lopez his rights in Spanish before the questioning began, and that he affirmatively stated that he understood each of the rights and was willing to talk to her. Accordingly, there was no basis for excluding Lopez's August 12, 2005, statement pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).

Second, there was nothing to suggest that either Lopez's waiver of his *Miranda* rights or his subsequent statement was involuntary. Although Lopez has doubtless spent more restful nights than the one he spent at the DEA offices, Campbell's credible testimony indicated that Lopez was not disoriented the next morning, but appeared to know "what was going on"(46). In addition, Martinez credibly testified that Lopez was articulate during their conversation and that he "sounded . . . educated" and "fairly intelligent" (63-64), while Campbell observed that Lopez appeared calm and cooperative (11, 46). There is nothing to suggest that Lopez, who was offered food and drink prior to the questioning and had a bottle of water with him throughout the 20- or 30-minute interrogation, was coerced into giving a statement. Rather, the credible facts suggested that Lopez, who had quickly agreed to cooperate following his arrest the preceding day, knowingly and voluntarily agreed to talk to Martinez in order to "do what he could to get out of trouble" (Campbell: 11).

Third, this Court concluded that suppression was not warranted under either Fed. R. Crim. P. 5(a) or 18 U.S.C. § 3501(c). Rule 5(a), enacted in 1946, provides in pertinent part:

> A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides . . . .

Fed. R. Crim. P. 5(a)(1)(A). Rule 5(c)(1) provides that, if a defendant is arrested in the district where the offense was allegedly committed and "if a magistrate judge is not reasonably available, the initial appearance may be before a state or local judicial officer."

Although Rule 5 itself does not create a remedy for violations of a defendant's right to prompt arraignment, the Supreme Court, in the exercise of its supervisory authority, established an exclusionary rule applicable to statements made after the government "unnecessarily" delayed arraignment. *See McNabb v. United States*, 318 U.S. 332, 341 (1943); *Mallory v. United States*, 354 U.S. 449, 455 (1957). This so-called *McNabb-Mallory* rule was subsequently codified, but limited, by the enactment of 18 U.S.C. § 3501(c) in 1968. This subsection provides:

> In any criminal prosecution by the United States . . ., a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or . . . agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States . . . if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided*, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.

18 U.S.C. § 3501(c) (emphasis in original). This subsection, which is frequently characterized as creating a "safe harbor," legislatively overruled the *McNabb-Mallory* rule only with respect to

6

"(1) unreasonable pre-arraignment, pre-confession delays of less than six hours and (2) reasonable delays in excess of six hours." *United States v. Perez*, 733 F.2d 1026, 1035 (2d Cir. 1984). Neither the Supreme Court nor the Second Circuit has held that this subsection requires a district court to suppress confessions made more than six hours after arrest. *See United States v. Alvarez-Sanchez*, 511 U.S. 350, 356 (1994) (finding it unnecessary to decide whether § 3501(c) requires suppression of a voluntary confession made more than six hours after arrest); *Perez*, 733 F.2d at 1030 (noting that it is "[p]erhaps . . . true that delay alone does not *require* suppression"). However, it is clear that "a district court has the discretion to suppress a confession if the delay between arrest and presentment is greater than six hours and is found by the court to be unreasonable under the circumstances." *United States v. Fullwood*, 86 F.3d 27, 31 (2d Cir.), *cert. denied*, 519 U.S. 985 (1996).

"In deciding whether a delay beyond six hours is unreasonable, the Second Circuit has found that delays attributable to overnight lodging and routine processing are not unreasonable." *United States v. Reyes*, Crim. No. B-90-47 (WWE), 1992 WL 363508, at *9 (D. Conn. Sept. 1, 1992) (citing *United States v. Rubio*, 709 F.2d 146, 154 (2d Cir. 1983) and *United States v. Collins*, 462 F.2d 792, 795 (2d Cir.), *cert. denied*, 409 U.S. 988 (1972)). Indeed, several district courts have interpreted Second Circuit caselaw as adopting the sort of "excludable time" calculations used in speedy trial analysis, in which time attributable to overnight lodging, routine arrest processing and other delays is excludable. *See United States v. Yanez*, No. 87 CR 187-2, 1987 WL 25926, at *4 (E.D.N.Y. Nov. 18, 1987); *United States v. Gomez*, 758 F.Supp. 145, 152 (S.D.N.Y. 1991). For example, in *Yanez*, the late Judge Bartels stated:

> The *Perez* court . . . define[s] "unreasonable delay" as that period of time, in excess of 6 hours after a defendant's arrest, that it is not legitimately excused. * * * Accordingly, under § 3501(c), time

7

> used for the following activities is excludable: fingerprinting; routine processing; ascertaining a defendant's true identity; allowing a defendant to eat breakfast; transporting him; and lodging him overnight.

*Id.* at *4 (internal quotations omitted).

Other courts, while not expressly adopting this "excludable time" approach, have nonetheless held that delays in excess of six hours are neither unnecessary nor unreasonable when most of the delay was attributable to processing, transit and overnight lodging. *See, e.g., United States v. Ospina*, No. 99 CR. 73 AGS, 2000 WL 37997, at *2 (S.D.N.Y. Jan. 18, 2000); *United States v. Copeland*, 830 F.Supp. 216, 220 (S.D.N.Y. 1993). *Ospina* is particularly similar to the case at bar. In that case, a defendant was arrested by DEA Agents at 2 p.m., driven around for several hours by agents who were searching for other defendants, brought to a precinct for processing at 5 p.m., housed overnight at the Manhattan Correctional Center and then questioned the following morning. Although the delay was well in excess of six hours, the *Ospina* Court held "that the delay between arrest and presentment was reasonable because [the defendant] spent most of the time in processing, transit, and overnight lodging." *Ospina*, 2000 WL 37997, at *2.

Under either the "excludable time" approach or the less precise analysis used by the courts in *Ospina* and *Copeland*, the delay between arrest and presentment in this case was reasonable. Although neither Campbell nor Martinez recalled precisely when Lopez left the hotel, Campbell testified that he left no later than 11 p.m., less than two hours after the arrest (Campbell: 7, 27). Lopez's next nine hours were either spent in transit to the DEA offices or attributable to overnight lodging. Lopez's interrogation began no earlier than 8 a.m., and Lopez

arrived in this courthouse sometime between 9:30 and 10 a.m. Based on Campbell's testimony that the ride from the DEA offices on 17th Street in Manhattan to the Brooklyn federal courthouse takes between 15 and 45 minutes, depending on traffic, this Court concluded that Lopez left the DEA offices no more than one hour and forty-five minutes after the interrogation began.

Under the "excludable time" analysis, at least nine and one-quarter of the twelve and one-half hours between the time of Lopez's arrest and his arrival at this courthouse are excludable. Since most, if not all, of the time Lopez spent at this courthouse prior to his arraignment was likely spent in routine pre-trial processing, this Court concludes that the unnecessary delay in this case amounted to well less than six hours. Alternatively, under the less precise *Ospina/Copeland* analysis, this Court concludes "that the delay between arrest and presentment was reasonable because [the defendant] spent most of the time in processing, transit, and overnight lodging." *See Ospina*, 2000 WL 37997, at *2. Under either analysis, the delay between Lopez's arrest and presentment was reasonable.

## CONCLUSION

For the reasons stated above, this Court denied the defense motion to suppress statements that defendant Lopez allegedly made on August 12, 2005.

**SO ORDERED.**

/SANDRA L. TOWNES
United States District Judge

Dated: Brooklyn, New York
May 12, 2006

9